UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

## 12 CIV 7315

------------------------------- X
                             :

MERRICK BANK CORPORATION,

                   Plaintiff,      :     **COMPLAINT**

       -against-          :

CHARTIS SPECIALTY INSURANCE COMPANY,    :

                 Defendant.    :

                             :
------------------------------- X

RECEIVED SEP 28 2012 U.S.D.C. S.D. N.Y. CASHIERS

Plaintiff Merrick Bank Corporation ("Merrick"), by its attorneys, Satterlee Stephens Burke & Burke, LLP, as and for its Complaint against Defendant Chartis Specialty Insurance Company ("Chartis"), respectfully alleges as follows:

### Nature of the Action

1.     Chartis issued an Uncollectible Chargeback Insurance Policy to Merrick for the period of July 1, 2011 to July 1, 2012 which required Chartis to provide up to $25 million of indemnity insurance coverage with respect to claims for "uncollectible chargebacks" from merchants whose credit and debit card transactions were honored by Merrick.

2.     This is an action seeking a declaratory judgment that the Chartis policy requires Chartis to pay Merrick all uncollectible chargebacks related to the merchant Myrtle Beach Direct Air ("Direct Air").  This action also asserts a breach of contract claim and a bad faith claim against Chartis.

3.     When a merchant processes a customer's credit or debit card transaction, an "acquiring bank" such as Merrick receives payment from the credit or debit card "issuing bank," through the applicable card association network (e.g., Visa, MasterCard).  Merrick takes a fee and then pays over to the merchant the funds paid by the customer.  If the customer later disputes the

credit or debit card charge (because, *inter alia*, they did not receive the goods or services purchased), then the debit or credit card holder can demand the money back from its issuing bank. The issuing bank will then initiate a "chargeback," which, in accordance with detailed card association regulations by which association member banks, like Merrick, are contractually bound, requires Merrick as acquiring bank to immediately return the customer funds to the issuing bank. Once those funds are properly charged-back, Merrick then collects the funds from the merchant.

4.     Occasionally, Merrick is unable to collect the charged-back funds from the merchant. This results in what is known in the industry as an "uncollectible chargeback."

5.     To protect itself from uncollectible chargebacks, Merrick purchased the uncollectible chargeback policy at issue from Chartis. Pursuant to the policy, Merrick paid an individual premium for each merchant covered thereunder. One of the listed covered merchants under the policy is public charter operator Direct Air.

6.     In mid-March, 2012 Direct Air abruptly shut down its charter tour services which included air travel services, resulting in the cancellation of thousands of pre-paid customer charter reservations and, shortly thereafter, the bankruptcy of Direct Air. As a result, Merrick has been unable to obtain reimbursement from Direct Air of chargbacks in excess of $25 million resulting from the failure of Direct Air to deliver the goods and services paid for by its customers.

7.     These uncollectible chargebacks are plainly a covered loss under the Chartis policy. Merrick timely provided notice of claim to Chartis and provided Chartis with the necessary documents to substantiate its covered losses.

8.     Chartis presently refuses to extend coverage primarily based on an unreasonable interpretation of a specific endorsement to the relevant policy. Chartis' ongoing refusal to extend coverage is in breach of its contractual obligations, resulting in present damages to

2

Merrick up to the policy limit of $25 million, plus cost and expenses incurred in connection with pursuing its rights under the Policy.  Accordingly, Merrick has initiated this action.

### The Parties

9.     Merrick Bank Corporation is a corporation organized and existing under the laws of Utah with its principal place of business in South Jordan, Utah.

10.     Chartis Specialty Insurance Company is a corporation organized and existing under the laws of a state other than Utah with its principal place of business at 175 Water Street, New York, NY 10038.

### Jurisdiction and Venue

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 in that there is complete diversity of citizenship between the parties and the matter in controversy exceeds $75,000, exclusive of interest and costs.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

### The Relevant Facts

A.     The Chartis Policy

13.     On or about July 1, 2011, Chartis issued to Merrick Uncollectible Chargeback Insurance Policy No.  7078195, an executed copy of which is attached as **Exhibit A** (the "Policy").  The Policy provides $25 million of coverage for a "**loss**" resulting from "**uncollectible chargebacks**" suffered during the policy period.  Defined terms in the Policy appear in bold typeface.

14.     An "**uncollectible chargeback**" is defined as a "chargeback the insured is legally or contractually obligated to pay and for which the insured has tried to collect and has been unable to collect from a **merchant**."

3

15.    In order to limit Chartis's possible exposure against any uncollectible chargeback, for certain covered merchants the Policy indicates a set amount to be held in reserve by Merrick.    Accordingly, for many merchants, Merrick had established a "**Merchant Reserve Account**," which the policy defines as a "cash account on deposit, letters of credit or other source of collateral *held by an insured* for a merchant . . ." [Emphasis added].

16.    In the "Limits of Indemnity and Deductible" section of the Policy, in addition to limiting coverage to amounts in excess of the deductible, sub-section 8(f)(1) limits coverage to the amount by which any loss exceeds:

> "the greater of (i) the balance in the **merchant reserve account** for such **merchant** as of the discovery of the first **uncollectible chargeback** for such **merchant**, and (ii) the amount indicated as the balance in the **merchant reserve account** for such **merchant** in an endorsement to this policy."

17.    Thus, under the Policy, Chartis is only required to cover losses exceeding the deductible plus the greater of (i) what was actually held in the **merchant reserve account** or (ii) what, if anything, the parties' agreed upon endorsement indicates the balance should be in the **merchant reserve account** for that **merchant**.

18.    Endorsement #4 of the Policy, a chart which identifies the merchant numbers of the merchants included for coverage, also contains a column entitled "Scheduled Reserve."  For Direct Air, there is no balance indicated in the Scheduled Reserve column; only the words "DOT Regulations" appear.

B.    The Direct Air Claim

19.    On March 13, 2012, Direct Air abruptly ceased operation.  On March 15, 2012, Direct filed for Chapter 11 bankruptcy, which bankruptcy was subsequently converted to a Chapter 7 liquidation.

20.     As a result, the thousands of Direct Air customers who had pre-paid by credit or debit card for goods and services to be delivered by Direct Air sought refunds, resulting in tens of thousands of chargebacks paid by Merrick.

21.     When Merrick then looked to Direct Air to recover on these chargebacks, Direct Air did not, and was unable to, provide such recovery.

22.     Notably, Federal Department of Transportation regulations (the "DOT Regulations") that governed Direct Air's operations as a public charter operator require that *all customer payments for charter services (for both land and air) be kept in segregated escrow accounts at DOT approved banks until the customer has completed travel.* 14 C.F.R. § 212.8; 14 C.F.R. § 380.34.

23.     At the time it filed bankruptcy, consistent with DOT Regulations requiring escrow of all customer funds until completion of travel, there should have been sufficient funds in DOT escrow accounts to cover the over $25 million in customer payments for charter services that were cancelled. This is the over $25 million in chargebacks that Merrick was legally obligated to pay, and which Merrick has in fact refunded to customers through their issuing banks.

C.      Chartis's Coverage Position With Respect to the Direct Air Claim

24.     Merrick timely notified Chartis of the Direct Air claim.

25.     On May 10, 2012 Chartis wrote to Merrick and indicated it was accepting the matter as a potential claim. Other than identifying purportedly relevant provisions of the Policy and requesting further information, Chartis did not take a coverage position in its May 10, 2012 correspondence and reserved all rights. However, Chartis specifically referenced Section 8(f) of the Policy and suggested that its coverage obligations might potentially be limited by the DOT Regulations.

26.     Merrick responded to Chartis on June 5, 2012, providing requested information and specifically addressing the DOT Regulations.  As Chartis' initial coverage response suggested that the reference to the DOT Regulations for Direct Air in Endorsement #4 limited Chartis' coverage obligations to only such amounts that exceeded what Direct Air was required to have in escrow pursuant to DOT Regulations, Merrick's June 5, 2012 letter addressed this baseless argument and demanded that Chartis advise whether in fact it intended to deny coverage except for losses in excess of the DOT Regulation escrow requirements.

27.     On September 5, 2012 Chartis responded, again reserving all rights, seeking further information and continuing to refuse to provide any coverage.  Significantly, however, Chartis asserted that its "obligations are [ ] excess to the amount of advance deposits that were legally required to be maintained in the escrow at Valley National Bank."

28.     Valley National Bank ("VNB") was Direct Air's DOT depository bank and at the time Direct Air filed for bankruptcy, there was just over $1 million in Direct Air's DOT escrow account at VNB.

29.     The DOT Regulations' escrow requirements, however, extend beyond Direct Air's DOT escrow account at VNB.  The DOT Regulations contemplate payment from Direct Air's escrow account to the actual air carrier's escrow account prior to departure.  14 C.F.R. § 380.34. The actual air carrier is required to have and maintain in its DOT escrow account all customer funds paid by the charter operator for the flight until it certifies in writing that charter has been completed. 14 C.F.R. § 212.8.  Thus, as the DOT Regulations expressly contemplate, all customer funds for charter services remain escrowed until the customer completes travel, be it in the charter operators escrow account or the actual air carrier's escrow account.

6

D.   Chartis is Obligated to Provide Coverage for all Direct Air Losses
Regardless of What DOT Regulations Required be Held in Escrow

30.     As previously noted, Endorsement #4 to the Policy lists the "Scheduled Reserve" for covered merchants.  For Direct Air, in the "Scheduled Reserve" column, rather than identifying a balance as per Section 8(f)(1) of the Policy (and as is identified with respect to certain other merchants), the entry states "DOT Regulations."

31.     Contrary to Chartis' purported interpretation of the Endorsement and the Policy, Chartis' coverage obligations are plainly *not* limited to only such amounts that exceeded what Direct Air was required to have in VNB escrow pursuant to DOT Regulations.

32.     First, the definition of "**merchant reserve account**" is limited to collateral "held by an insured."  The DOT Regulations, however, require that the Direct Air customer funds be deposited into escrow accounts held by DOT approved banks, 14 C.F.R. § 212.8(b), not by the insured (Merrick).  Therefore, based on the plain language of the Policy, escrow funds are not in a **merchant reserve account** and they do not decrease the covered **loss**.  Indeed, the relevant DOT Regulations do not permit Merrick to divert customer funds into a **merchant reserve account**. 14 C.F.R. 380.34(b)(2).

33.     The Policy simply does not permit Chartis to limit coverage by the amount required to be held, not by Merrick in a **merchant reserve account**, but by third-party banks that Merrick does not control in escrow accounts governed by agreements to which Merrick is not a party.

34.     Second, Chartis' attempt to equate a **merchant reserve account** with DOT escrow requirements based on the "DOT Regulations" reference in Endorsement # 4 necessarily fails because such an interpretation would render coverage for any and all Direct Air **uncollectible chargebacks** illusory.  The relevant DOT Regulations require that *all* customer payments to Direct

7

Air for charter services be held in escrow until the customer has completed travel. 14 C.F.R. § 212.8; 14 C.F.R. § 380.34.   While DOT Regulations permit VNB to transfer escrowed funds to the direct air carriers' DOT escrow account prior to customer travel, the funds cannot leave either the charter operator or direct carriers' escrows until travel is complete.

35.     Accordingly, even though Merrick paid a specific and substantial premium for coverage by Chartis specifically for Direct Air transactions, Chartis' interpretation of the Policy would preclude Merrick from ever receiving coverage on any Direct Air transactions. An outcome rendering the Policy illusory for this covered **merchant**.

36.     Third, an interpretation of the Policy limiting coverage to amounts in excess of the amount required to be held in escrow by VNB pursuant to DOT Regulations is ambiguous *at best*, and must be construed against the insurer.

37.     Presently, while Chartis continues to maintain its unreasonable policy position, it is also unnecessarily requiring Merrick to incur additional and significant expense in assisting Chartis in analyzing the data relating to the uncollectible chargebacks at issue.   Chartis seeks to distinguish between amounts paid by credit card customers for flights and accommodations as opposed to baggage fees and related incidental costs.

38.     Chartis is therefore demanding Merrick provide access to third party vendor data at a significant cost so Chartis can identify a fractional amount of the actual losses Merrick suffered – namely, customer charges for baggage fees and related incidental fees – which it may then agree to cover.  This transparent effort to limit its $25 million coverage obligation to an amount that is just a small fraction, at most, of the actual uncollectible chargebacks is clear evidence of its bad faith, further damaging Merrick.

39.     Given Chartis's improper attempt to deny or limit coverage, Merrick seeks a declaration as to Chartis's coverage obligations under the Policy and seeks recovery of its present damages of $25 million based on Chartis' breach of its coverage obligations.

## FIRST CAUSE OF ACTION

40.     Merrick repeats and realleges each and every allegation contained in paragraphs 1 through 39, inclusive, of the Complaint with the same force and effect as if fully set forth herein.

41.     The Policy issued to Merrick obligates Chartis to provide $25 million of coverage with respect to uncollectible chargebacks incurred for covered merchants such as Direct Air.

42.     Chartis has refused to acknowledge and has instead denied and repudiated its obligation to provide Merrick with coverage for all uncollectible chargeback losses Merrick has incurred with respect to Direct Air.

43.     An actual and justiciable controversy has arisen and now exists between Chartis and Merrick concerning the construction and interpretation of the Policy in relation to the obligation of Chartis to indemnify Merrick for losses under the Policy.

44.     Merrick desires and is entitled to a judicial determination of its rights and the obligations of Chartis under the Policy.  Such a declaration is necessary and proper at this time.

45.     Accordingly, Merrick seeks a declaration that Chartis is obligated to provide Merrick with $25 million of coverage.

## SECOND CAUSE OF ACTION

46.     Merrick repeats and realleges each and every allegation contained in paragraphs 1 through 45, inclusive, of the Complaint with the same force and effect as if fully set forth herein.

47.     The Policy is a contract of insurance between Chartis and Merrick.

48.     The Policy obligates Chartis to provide $25 million of coverage with respect to uncollectible chargebacks incurred for covered merchants such as Direct Air.

49.     Merrick has duly submitted its claim for covered losses under the Policy relating to Direct Air uncollectible chargebacks.

50.     Chartis has refused to acknowledge and has instead denied and repudiated its obligation to provide Merrick with coverage for all uncollectible chargeback losses Merrick has incurred with respect to Direct Air.

51.     Chartis' failure and/or refusal to provide coverage for the Direct Air claim is in breach of its contractual obligations to Merrick.

52.     As a result of Chartis's breach, Merrick has suffered damages of $25 million, plus costs incurred in connection with obtaining amounts due under the Policy.

## THIRD CAUSE OF ACTION

53.     Merrick repeats and realleges each and every allegation contained in paragraphs 1 through 52, inclusive, of the Complaint with the same force and effect as if fully set forth herein.

54.     By entering into the Policy with Merrick, Chartis undertook an implied duty of good faith and fair dealing to Merrick.

55.     Chartis has breached its duty of good faith and fair dealing and acted in bad faith by (a) advancing unreasonable and unjustified positions with respect to its coverage obligations on the Direct Air claim; (b) failing to properly conduct a timely, reasonable and thorough investigation of the relevant facts prior to refusing to provide Merrick with coverage for the Direct Air claim; (c) placing its own interests ahead of those of its insured; (d) forcing Merrick

10

to incur unnecessary expenses; and (e) compelling Merrick to institute litigation to recover amounts due under the Policy.

56.    As a result of the aforementioned wrongful and improper conduct on the part of Chartis, Merrick has suffered actual and consequential damages and out-of-pocket expenses, including attorneys' fees and costs, and other foreseeable economic losses all to Merrick's damage, in a total amount to be shown by proof at the time of trial.

57.    Merrick is entitled to recover any and all attorneys' fees and costs that it reasonably incurs in its efforts to obtain policy benefits, that have been wrongfully and in bad faith withheld by Chartis.

WHEREFORE, Merrick prays for judgment against Chartis as follows:

ON THE FIRST CAUSE OF ACTION

For a declaration that the Policy issued by Chartis under which Merrick seeks coverage herein obligates Chartis to provide Merrick with coverage with respect to the claims submitted by Merrick for Direct Air uncollectible chargebacks.

ON THE SECOND CAUSE OF ACTION

For an award of damages in the full policy amount of $25 million plus costs incurred in connection with obtaining amounts due under the Policy due to Chartis's breach of the insurance contract with Merrick.

ON THE THIRD CAUSE OF ACTION

1.    For actual damages in an amount to be determined at the time of trial against Chartis, plus interest;

2.    For consequential damages against Chartis according to proof at trial, plus interest;

11

1497785_6

3.    For attorneys' fees and costs incurred by Merrick in its efforts to obtain policy benefits wrongfully withheld by Chartis;

4.    For such other further and different relief as this Court deems just and proper.

Dated: New York, New York
       September 28, 2012

SATTERLEE STEPHENS BURKE & BURKE LLP

By: _____
    Daniel G. Gurfein
    James Regan
Attorneys for Merrick Bank Corporation
230 Park Avenue
New York, New York  10169
(212) 818-9200

12

# Exhibit A



**CHARTIS SPECIALTY INSURANCE COMPANY**
(a capital stock company, herein called the **insurer, we, us or our**)
175 Water St., New York, NY 10038

> NOTICE: THIS INSURER IS NOT LICENSED IN THE STATE OF NEW YORK
> AND IS NOT SUBJECT TO ITS SUPERVISION

### UNCOLLECTIBLE CHARGEBACK INSURANCE POLICY

### DECLARATIONS

**Policy Number:** 7078195

| | | |
|---|---|---|
| Item 1. | Policyholder: | Merrick Bank Corporation |
| | Principal Address: | 10705 South Jordan Gateway<br>Suite 135 Crossways Park Drive<br>Woodbury, NY 11797 |

Item 2.    **Policy Period:** from 12:01 a.m. on 07/01/2011
to 12:01 a.m. on 07/01/2012 Eastern standard time

Item 3.    Limits of Indemnity:
Annual Aggregate Limit of Indemnity:    $ 25,000,000
**Covered Transaction** Limit:    $ 7,500
**Single Loss** Limit of Indemnity:    $ 25,000,000

Item 3b.    Annual Aggregate Limit of Indemnity for    $1,000,000
Card Association Assessments

Merchant Sublimit of Insurance for    $ 25,000
*Card Association Assessments*

Item 4.    **Single Loss** Deductible:    $250,000 on Card Present Transactions
$250,000 on Card Not Present Transactions

Item 5.    Deposit Premium:    $ 60,000

Minimum Monthly Premium:    $ N/A

Premium will be calculated by multiplying the Covered Transaction
Rate by the number of Covered Transactions reported monthly

    (c) Chartis Inc. All rights reserved.

Item 6.     Covered Transaction Rate:

$ 0.000229 (2.29) Basis Points For Card Present Transactions

$ 0.000951 (9.51) Basis Points For Card Not Present Transactions

Item 7.        Endorsements Attached:
1. OFAC Endorsement
2. Special Merchant Endorsement
3. Subrogation Endorsement
4. Merchant Schedule Endorsement
5. Card Association Assessment Coverage Endorsement
6. Obligations Amendatory Endorsement
7. Merchant Schedule Endorsement

_8-18-2011_                          _____
        Date                          Authorized Representative

## CHARTIS SPECIALTY INSURANCE COMPANY

OFAC Endorsement #1

This endorsement, effective 07/01/2011 12:01 AM forms a part of policy number 7078195 issued to Merrick Bank Corporation by Chartis Specialty Insurance Company.

### ı THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

### ENDORSEMENT #1

### COVERAGE TERRITORY ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Payment of **loss** under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

AUTHORIZED REPRESENTATIVE

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

© Chartis Inc.  All rights reserved.

**CHARTIS SPECIALTY INSURANCE COMPANY**

<u>Special Merchant Endorsement (Modified) #2</u>

This endorsement, effective <u>07/01/2011 12:01 AM</u> forms a part of policy number <u>7078195</u> issued to <u>Merrick Bank Corporation</u> by <u>Chartis Specialty Insurance Company</u>.

**SPECIAL MERCHANT ENDORSEMENT**

In consideration of the premium charged, it is hereby understood and agreed that the policy is amended as follows:

1.  In Clause 2. DEFINITIONS, paragraph q. (definition of "**special merchant**") is deleted in its entirety and replaced with the following:

    q.  **Special Merchant** means any **merchant** engaged in any of the business categories listed below:

        Gambling and/or Gaming
        Escort Services
        Massage Parlors

_8-18-2011_
_____
Date

_____
Authorized Representative

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.
(c) Chartis Inc.  All rights reserved.

# CHARTIS SPECIALTY INSURANCE COMPANY

### Subrogation Amendment Endorsement #3

This endorsement, effective 07/01/2011 12:01 AM forms a part of policy number 7078195 issued to Merrick Bank Corporation by Chartis Specialty Insurance Company.

It is agreed that Item 7 of the Policy is deleted in its entirety and replaced with the following:

7. ASSISTANCE, COOPERATION, SUBROGATION AND RECOVERIES The insured shall provide us with all information, assistance and cooperation that we or our counsel may reasonably request. The insured shall not take any action, which in any way increases our exposure under this policy.

In the event of any payment under this policy, we shall be subrogated to the insured's rights of recovery therefore against any person or entity; provided that respecting any such remedies you may have against any Independent Sales Organizations, we shall only seek such remedies in the event we find any evidence of fraud, misrepresentation, misconduct, recklessness, or negligence by such Independent Sales Organizations, or any of its principals, partners, agents, representatives, directors, officers, or employees.

The insured shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable us effectively to bring suit in our name, and shall provide all other assistance and cooperation which we may reasonably require. The insured shall do nothing to prejudice such rights.

All recoveries, whether effected by you, the insured or us (except for recoveries from the reinsurance and/or indemnity of us), shall be applied (after first deducting the reasonable costs and expenses, incurred in obtaining in such recoveries) in the following order of priority:

1. You and the insured shall be fully reimbursed for the amount, if any, by which a loss covered under this policy exceeds the amount paid by us under this policy;

2. We shall then be fully reimbursed for all amounts paid under this policy; and

3. Any remaining sum shall be paid to you and the insured as reimbursement of the Deductible and/or for the amount of its loss, which is not covered under this policy.

In determining the amount payable by **us** under this policy for **loss**, all money and all other property and fees received from the **merchant** in connection with the chargeback by or for the benefit of **you** or the **insured** shall be deducted from the claimed **loss**.

_____
AUTHORIZED REPRESENTATIVE

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

⊗ Chartis Inc.  All rights reserved.

# CHARTIS SPECIALTY INSURANCE COMPANY

### Merchant Schedule Endorsement #4

This endorsement, effective 7/01/2011 12:01 AM forms a part of policy number 7078195 issued to Merrick Bank Corporation by Chartis Specialty Insurance Company.

It is agreed that each merchant listed in this endorsement is included for coverage solely with respect to the Merchant Number(s) scheduled below:

| Merchant Name | Merchant Number BIN/PRIN | Scheduled Reserve | Scheduled Deductible |
|---|---|---|---|
| Apple Vacations West | 447474210000133 | 1,000,000 | 500,000 |
| Apple Vacations East | 447474210000135 | Included | 500,000 |
| Apple Vacations | 447474210000136 | Included | 500,000 |
| GWV – Apple Vacations | 447474210000139 | Included | 500,000 |
| USA3000 Airlines | 447474310000100 | | 500,000 |
| USA3000 Airlines | 447474310000101 | | 500,000 |
| Cheap Caribbean | 447474300000003 | | 250,000 |
| MSC Cruises | 454045495000013 | | 250,000 |
| Media Temple | 454045274000166 | | 250,000 |
| Myrtle Beach Direct Air | 454045211000109 | DOT Regulations | 250,000 |
| Skyauction.com | 454045211000095 | | 250,000 |
| Group Voyagers | 454045232000010 | | 250,000 |
| Group Voyagers | 454045232000011 | | 250,000 |
| Group Voyagers | 454045232000012 | | 250,000 |
| Group Voyagers | 454045232000013 | | 250,000 |
| Group Voyagers | 454045232000014 | | 250,000 |
| Group Voyagers | 454045232000015 | | 250,000 |
| Group Voyagers | 454045232000016 | | 250,000 |
| Group Voyagers | 454045232000017 | | 250,000 |
| Group Voyagers | 454045232000018 | | 250,000 |
| Group Voyagers | 454045232000019 | | 250,000 |
| Group Voyagers | 454045232000020 | | 250,000 |
| Kink.com | 461074230102154 | | 250,000 |
| Cave Creek - CCBill | 6331745501000440 | 4,000,000 | 250,000 |
| CCBill.com | 6331745501000446 | | 250,000 |
| CCBill.com | 6331745501000510 | | 250,000 |
| CCBill.com | 6331745501000443 | | 250,000 |
| CWIE, LLC - CCBill | 6331745501000441 | | 250,000 |
| CWIE, LLC - CCBill | 6331745501000441 | | 250,000 |
| DRM Networks - CCBill | 6331745501000442 | | 250,000 |
| City Share | 6314160014051105 | | 250,000 |
| E-Travel | 2867160015019021 | | 250,000 |
| Billy Boys | 444746220212682 | | 250,000 |
| Abercrombie & Kent | 444746210130787 | | 250,000 |

| | | | |
|---|---|---|---|
| | | 5,000,000 | |
| Book It | 444746220141006 | 1,000,000. Letter of Credit | 250,000 |
| Interactive Life Forms LLC | 444746210257739 | | 250,000 |
| Team Effort | 444746210190823 | | 250,000 |
| Oregano Gold International, Inc. | 444746210155396 | | 250,000 |
| Oregano Gold International, Inc. | 444746210172664 | | 250,000 |
| ECHST.NET866-452-5108 | 6322970303000305 | | 250,000 |
| ECHST.NET866-452-5108 | 6322970303001006 | | 250,000 |
| ECHST.NET866-452-5108 | 6322970303001014 | | 250,000 |
| cc@vs.3.com800-935-5773 | 6322970303000958 | | 250,000 |
| MFCBill.com | 6322970303001741 | | 250,000 |
| Vacation Roost | 454045211000123 | | 250,000 |
| Liberty Media Holdings | 6322970303001733 | | 250,000 |
| Competition.Cams | TBD | | 250,000 |
| Tours For Fun | 4447464220398780 | | 250,000 |
| LaTouraine | 461074310100029 | 14 day rolling | 250,000 |

8-18-20     _____

_____
Date

_____
Authorized Representative

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

© Chartis Inc.  All rights reserved.

# CHARTIS SPECIALTY INSURANCE COMPANY

## Card Association Assessment Coverage Endorsement #5

This endorsement, effective 07/01/2011 12:01 AM forms a part of policy number 7078195 issued to Merrick Bank Corporation by Chartis Specialty Insurance Company.

## CARD ASSOCIATION ASSESSMENT COVERAGE ENDORSEMENT

In consideration of the premium charged, and in reliance on the statements in the application(s) attached hereto and made part hereof, it is hereby understood and agreed as follows:

1. Unless otherwise set forth herein, the terms, conditions and exclusions contained in this endorsement shall apply only to the coverage afforded under this endorsement.

2. Solely with respect to the coverage afforded under this endorsement, Clause I. **INSURING AGREEMENT** is hereby deleted in its entirety and replaced with the following:

   ### 1. INSURING AGREEMENT

   We shall pay the **insured** for **loss**, in excess of any applicable deductible, discovered by the **insured**, and reported to **us**, during the **policy period** or **discovery period**, resulting from any **data security event** occurring during the **policy period**.

3. Solely with respect to the coverage afforded under this endorsement, Clause 2, **DEFINITIONS**, paragraph i. **Loss** is amended to include the following at the end thereof:

   Notwithstanding the foregoing paragraph 5., **loss** does include **card association assessments** that are: (1) incurred by a **merchant** of the **insured** as the result of a **data security event**, (2) are not paid by the **merchant**, and (3) become the responsibility of the **insured**.

4. Solely with respect to the coverage afforded under this endorsement, Clause 2, **DEFINITIONS** is amended by appending the following definitions at the end of such Clause:

   CA-A. **Card association** means each of Visa International, MasterCard Worldwide, Discover Financial Services, JCB, American Express and any similar credit or debit card association that is a participating organization of the PCI Security Standards Council.

   CA-B. **Card association assessment** means a monetary assessment, fee, fine or penalty levied against a **merchant** or the **named insured** by a **card association** as the result of (i) a **data security event** or (ii) a security assessment conducted as the result of a **data security event**. The **card association assessment** shall not exceed the maximum monetary assessment, fee, fine or penalty permitted upon the occurrence of a **data security event** by the applicable rules or agreement in effect as of the inception date of the **policy period** for such **card association**.

CA-C. **Cardholder** means a natural person or entity to which a **bank card** has been issued.

CA-D. **Cardholder Information** means the data contained on a **bank card**, or otherwise provided to a **merchant**, that is required by the card association or the **named insured** in order to process, approve and/or settle a **bank card** transaction.

CA-E. **Data security event** means the actual or suspected unauthorized access to or use of **cardholder information**, arising out of a **merchant's** possession of or access to such **cardholder information**, which has been reported (a) to a **card association** by a **merchant** or the **named insured** or (b) to the **merchant** or the **named insured** by a **card association**. All card association assessment expenses resulting from the same, continuous, related or repeated event or which arise from the same, related or common nexus of facts, will be deemed to arise out of one **data security event**.

CA-F. **Notice period** means the sixty (60) day period of time the **named insured** shall have to notify us that a **data security event** has occurred. The **notice period** shall commence immediately upon first discovery of the **data security event** by the **named insured**.

5. Solely with respect to the coverage afforded under this endorsement, Clause 5. **EXCLUSIONS**, h. (theft/dishonesty exclusion) is deleted in its entirety.

6. Solely with respect to the coverage afforded under this endorsement, Clause 5. **EXCLUSIONS** is hereby amended by appending the following at the end of such Clause:

This policy shall not apply to:

A. any *loss* arising out of or resulting, directly or indirectly, from any dishonest, fraudulent, criminal or malicious act, error or omission, or any intentional or knowing violation of the law, if committed by the **named insured's**:

   1. directors, officers, tru stees, governors, management committee members, members of the management board or partners (or the equivalent positions), whether acting alone or in collusion with other persons; or

   2. employees (other than officers) if any of t he **named insured's** elected or appointed officers possessed knowledge of any such:

      a) dishonest, fraudulent, malicious, or criminal or malicious act, error or omission;

      b) intentional or knowing violation of the law or the **privacy policy** of the **named insured**, or

      c) gaining of any profit or advantage to which the **named insured** is not legally entitled;

prior to or at the time (a), (b) or (c) above were committed;

B.  any data security event caused by or resulting, directly or indirectly, from an act, error or omission of the named insured, including, without limitation, (i) the disclosure of any cardholder information by the named insured, its employees or any person or entity to whom the named insured provides cardholder information, or (ii) any failure of the named insured's security, computer system or payment processing network; provided however, this exclusion does not apply to the actual or alleged failure of the named insured to monitor the operations of, or the security procedures or computer systems used by, any merchant;

C.  any loss arising out of or resulting from a claim, suit, action or proceeding against the named insured or a merchant that is brought by or on behalf of any federal, state or local government agency;

D.  any data security event relating to a merchant which has experienced a prior data security event unless such merchant was later certified as PCI compliant by a qualified security assessor;

E.  any data security event arising out of a merchant allowing any party (other than its employees or the named insured) to hold or access cardholder information;

F.  any data security event involving: (i) a merchant categorized by any card association as "Level 1" or (ii) a merchant that processed more than six million (6,000,000) bank card transactions during the twelve month period prior to the policy period;

G.  any loss, other than card association assessments, incurred by the named insured or a merchant, arising out of or resulting, directly or indirectly, from a data security event, including without limitation, expenses incurred to bring a merchant into compliance with the PCI Data Security Standard or any similar security standard;

H.  any loss arising out of or resulting, directly or indirectly, from physical injury, sickness, disease, disability, shock or mental anguish sustained by any person, including without limitation, required care, loss of services or death at any time resulting therefrom;

I.  any loss arising out of or resulting, directly or indirectly, from any of the following:
    1.  fire, smoke, explosion, lightning, wind, water, flood, earthquake, volcanic eruption, tidal wave, landslide, hail, an act of God or any other physical event, however caused;
    2.  strikes or similar labor action, war, invasion, act of foreign enemy, hostilities or warlike operations (whether declared or not), civil war, mutiny, civil commotion assuming the proportions of or amounting to a popular rising,

military rising, insurrection, rebellion, revolution, military or usurped power, or any action taken to hinder or defend against these actions; or

3. electrical or mechanical failures, including any electrical power interruption, surge, brownout or blackout; a failure of telephone lines, data transmission lines, satellites or other infrastructure comprising or supporting the Internet, unless such lines or infrastructure were under the **named insured's** operational control;

J. any **loss** arising out of or resulting, directly or indirectly, from the presence of or the actual, alleged or threatened discharge, dispersal, release or escape of pollutants (including nuclear materials), or any direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or in any way respond to or assess the effects of pollutants;

K. any **data security event** that was not properly reported to us during the notice period;

L. any **data security event** occurring before the effective date of the agreement between the relevant **merchant** and the **named insured** to process bank card transactions, or after the termination of such agreement;

M. any expenses incurred for, or as a result of, regularly scheduled, recurring or routine security assessments, regulatory examinations, inquiries or compliance activities;

N. any (1) gaining of a profit or advantage to which the **named insured** is not legally entitled; or (2) the **named insured's** expenses or charges, including employee compensation and benefits, overhead, over-charges or cost over-runs;

O. any liability or obligation of the **named insured** under any contract or agreement; however, this exclusion shall not apply to (i) liability the **named insured** would have in the absence of such contract or agreement, (ii) liability or obligation under any customer processing agreement with a **merchant**, or (iii) any agreement with a **card association** relating to the **named insured's** processing and settling of transactions involving **bank cards** issued or authorized by such **card association**;

P. any **data security event** that first occurred prior to 07/01/2011

Q. any **loss** arising out of or resulting, directly or indirectly, from the infringement of copyright, patent, trademark, trade secret or other intellectual property rights; or

R. any **loss** alleging, arising out of or resulting, directly or indirectly, from any discrimination against any person or entity on any basis, including but not limited to: race, creed, color, religion, ethnic background, national origin, age, handicap, disability, sex, sexual orientation or pregnancy.

7. Solely with respect to the coverage afforded under this endorsement, Clause 7. ASSISTANCE, COOPERATION, SUBROGATION AND RECOVERIES, is hereby amended by appending the following:

### DUTIES IN THE EVENT OF A DATA SECURITY EVENT

A. Before coverage will apply under this **policy**, the **named insured** shall notify us in writing as soon as practicable within the **notice period** of an actual or alleged **data security event** first discovered by the **named insured** during the **policy period**. Notice must include:

1. The name of the **merchant**;

2. A description of the **data security event**;

3. The n umber of **cardholders** affected by the **data security event**; and

4. A copy of all notices and correspondence from the **named insured**, the **merchant**, or a **card association** concerning the **data security event**.

B. U nder all circumstances, the **named insured** shall not admit any liability, assume any financial obligation, pay any money, or incur any expense in connection with any **data security event** without **our** prior written consent. If the **named insured** does, it will be at the **named insured's** own expense.

C. The **named insured** shall take reasonable steps to prevent a **data security event** and to mitigate the loss arising out of a **data security event**, including without limitation, following the procedures required by a **card associations** in the event of a **data security event**. In all events, no **named insured** shall take any action, or fail to take any action, without **our** prior written consent, which prejudices **our** rights under this **policy**.

8. Solely with respect to the coverage afforded under this endorsement, Clause 8. LIMITS OF INDEMNITY AND DEDUCTIBLE, is hereby amended by appending the following:

CA-A. The most we shall pay for the total of all **card association** assessments arising out of or relating to any **merchant** is the Per **Merchant Sublimit of Insurance** indicated in Item 3.B. of the Declarations; regardless of the number of **data security events** first discovered by the **named insured** during the **policy period** and reported to us within the **notice period**. The Per **Merchant Sublimit of Insurance** is part of, and not in addition to the **Aggregate Limit of Insurance**.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED.

# CHARTIS SPECIALTY INSURANCE COMPANY

**Obligations Amendatory Endorsement #6**

This endorsement, effective 07/01/2011 12:01 AM forms a part of policy number 7078195 issued to <u>Merrick Bank Corporation</u> by <u>Chartis Specialty Insurance Company</u>.

It is agreed that Item 3, paragraph A of the Policy is deleted in its entirety and replaced with the following:

    a.  Operating Procedures

        The **insured** agrees to comply with any and all rules, regulations, policies and/or procedures of VISA, Mastercard, Discover. The **insured** further agrees that in the event it receives written notification from VISA, Mastercard, Discover of any change to any rule, regulation, policy or procedure of VISA, Mastercard, Discover, the **insured** will adhere to such change within 60 days after the mandatory compliance date.

It is further agreed that Item 5, paragraph S of the Policy is deleted in its entirety and replaced with the following:

    s.  any failure by the insured to comply with any new rules, regulations, policies and/or procedures of VISA, MasterCard, and/or Discover within 60 days after the mandatory compliance date required by such rule, regulation, policy or procedure.

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

    © Chartis Inc.  All rights reserved.

**AUTHORIZED REPRESENTATIVE**

©Chartis Inc. All rights reserved

_Sean Nosti_

AUTHORIZED REPRESENTATIVE

# CHARTIS SPECIALTY INSURANCE COMPANY

*OFAC Endorsement #1*

This endorsement, effective <u>07/01/2011 12:01 AM</u> forms a part of policy number <u>7078195</u> issued to <u>Merrick Bank Corporation</u> by <u>Chartis Specialty Insurance Company</u>.

## | THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## ENDORSEMENT #1

## COVERAGE TERRITORY ENDORSEMENT

*This endorsement modifies insurance provided under the following:*

Payment of **loss** under this policy shall only be made in full compliance with all United States of America economic or trade sanction laws or regulations, including, but not limited to, sanctions, laws and regulations administered and enforced by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC").

_____
AUTHORIZED REPRESENTATIVE

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

© Chartis Inc.  All rights reserved.



## UNCOLLECTIBLE CHARGEBACK INSURANCE POLICY

This policy provides coverage with benefits to the **insured**. Please read the entire policy to determine the **insured's** rights and duties and what is and what is not covered under this policy.

Words and phrases that appear in boldface are defined in the Definitions Section.

In consideration of the premium paid and in reliance upon **your** statements to **us**, we agree to provide to the **insured** the insurance described in this policy.

## 1. INSURING AGREEMENT

We shall pay the **insured** for **loss**, in excess of any applicable deductible, discovered by the **insured**, and reported to **us**, during the **policy period** or **discovery period**, resulting from **uncollectible chargebacks** occurring during the **policy period**.

## 2. DEFINITIONS

For purposes of this Policy:

a.   **Application** means all signed **applications** for this policy and for any policy in an uninterrupted series of policies issued by **us** or any affiliate of **ours** of which this policy is a renewal or replacement.

b.   **Bank card** means any card branded by VISA, MasterCard or Discover, or by a financial institution as a member of VISA, MasterCard or Discover.

c.   **Cancelled merchant** means any **merchant** designated as such pursuant to Section 3.c. of this policy.

d.   **Chargeback** means the amount the **insured** is legally obligated to pay to a cardholder's **bank card** account, at the request of the cardholder and after a reasonable investigation by the **insured** in accordance with section 3.a. of this policy determines that (1) no goods or services were received by the cardholder from a **merchant** in connection with such amount; (2) the cardholder did not authorize the payment; or (3) the **chargeback** is permitted under the applicable rules of Visa, MasterCard or Discover.

e.   **Covered transaction** means the purchase of goods or services from a **merchant** where payment is made using a **bank card** and such payment is processed on behalf of such **merchant** by the **insured** during the **policy period**.

1

(c) Chartis Inc.  All rights reserved.

f.  Discovery period means the period beginning immediately upon the termination of the **policy period** and ending one hundred and eighty (180) days after the termination of the **policy period**.

g.  **Independent Sales Organization** means an entity or an individual, which has contracted with the **named insured** to solicit or service **merchants** on behalf of the named **insured**.

h.  **Insured** means the **named insured** and any other entity added by endorsement to this policy.

i.  **Loss** means the amount of **uncollectible chargeback** resulting directly from a **covered transaction** in excess of the balance in any applicable **merchant reserve account** regardless of whether such account (i) is in the custody or possession of an **insured**, or (ii) may be legally drawn down by any **insured**.

Loss does not include:

1.  interest, penalties or fines;

2.  any consequential damages, including but not limited to lost potential income, interest or dividends;

3.  any fees, costs or expenses incurred by **insured** in establishing the existence of or amount of **loss** covered under this policy;

4.  any fees, costs or expenses incurred in defending against any claim, arbitration, lawsuit or any other judicial or administrative proceeding; and

5.  assessments and penalties imposed by VISA, MasterCard or Discover and incurred by an **insured** relating directly to a **covered transaction** or a **chargeback**.

j.  **Magnetic stripe reader** means a device that reads account information on the magnetic stripe of a bankcard.

k.  **Merchant** means any entity with which an **insured** or an **independent sales organization** has a written contract providing for the administration and processing of **covered transactions**, on behalf of such entity and includes principals, officers and employees of such entity but only while acting within the scope of their duties as such.

l.  **Merchant Fraud** means an intentional dishonest, fraudulent, criminal or illegal act committed by a **merchant** against one of that **merchant's** customers or the **Insured** in connection with a **covered transaction**.

m.  **Merchant Reserve Account** means a cash account on deposit, letters of credit or other source of collateral held by an **insured** for a **merchant** in

(c) Chartis Inc. All rights reserved.

excess of any chargeback fees or fines assessed against an independent sales organization or acquiring bank.

n.     **Policy Period** means the period from the effective date of this policy to the policy expiration date stated in Item 2 of the Declarations, or its earlier cancellation date.

o.     **Retail Merchant** means a **merchant**, other than a **special merchant**, who has a storefront or uses a **magnetic stripe reader**, and who either obtains a signed receipt from the cardholder in at least 75 percent of its **covered transactions**, or does at least 75 percent of its **covered transactions** on such **magnetic stripe reader** following a face to face transaction with a customer.

p.     **Single loss** means all loss arising from all **uncollectible chargebacks** of a **merchant**.

q.     **Special merchant** means a **merchant** engaging in any business or industry set forth in a **Special Merchant** Endorsement to this policy.

r.     **Uncollectible chargeback** means a **chargeback** the **insured** is legally or contractually obligated to pay and for which the **insured** has tried to collect and has been unable to collect from a **merchant**.

s.     **We, us and ours** means the insurance company providing the insurance.

t.     **You, your and named insured** means the policyholder named in Item 1 of the Declarations.

## 3. OBLIGATIONS OF THE INSURED

As a condition precedent to coverage under this **policy**, the **insured** shall at all times have the duties and obligations set forth in this section.   These duties and obligations are in addition to any obligations otherwise provided for under this **policy**.

a.     **Operating Procedures**

The **insured** shall comply with and adhere to VISA, MasterCard and/or Discover Operating Regulations, Policies and Procedures. Any failure by the **insured** to adhere to and comply with such regulations, policies and/or procedures shall result in no coverage under this policy for **loss** related to such failure.

b.     **Merchant Screening**

The **named insured** agrees that an **insured** or an **independent sales organization** shall screen each **merchant**, which screening will include, without limitation:

3

(c) Chartis Inc.  All rights reserved.

1.  submission of a signed merchant application that includes the name of the **merchant**, the officers, principals and/or owners, the location(s) of the business, the type of business, the goods and/or services sold, and projected annual sales revenue;

2.  execution of a merchant agreement;

3.  review of any previous merchant processing activity, including a copy of a MATCH report in the corresponding **merchant** region (United States, Canada, Asia/Pacific, Caribbean/Latin America, CEMEA-Central & Eastern Europe, Middle East & Africa) confirming history of no prior problems **on MATCH**, financial statements, income tax returns and credit reports of principals and officers, where applicable; and

4.  ongoing monitoring by the **insured, Independent Sales Organization** or any third party monitoring company retained by the **insured** for all **merchant** transactions where applicable (CVV2, AVS, etc.).

c.  **Cancelled Merchants**

A **merchant** shall be deemed a **cancelled merchant**:

1.  if such **merchant** has three consecutive calendar months with **chargebacks** of greater than three percent (3%) of the total dollar amount transacted in each month;

2.  if such **merchant** has **chargebacks** of more than six percent (6%) in any calendar month;

3.  if the guidelines of MasterCard, Visa or Discover mandate that such **merchant** not be allowed to accept cards from such payment network;

4.  upon **your** first knowledge or discovery of any **merchant fraud** committed directly by such **merchant** or by any employee, officer, director or agent of such **merchant**, whether acting alone or in concert with others;

5.  upon **your** first knowledge or discovery that such **merchant** has (a) become insolvent, (b) filed a bankruptcy petition, (c) had an involuntary bankruptcy petition filed against them, (d) been put in receivership or (e) had any other proceeding commenced in an federal, state or foreign jurisdiction relating to its financial impairment; or

6.  if **we**, in **our** sole and absolute discretion, designate such **merchant** cancelled.

Each **merchant** deemed or designated a **cancelled merchant** pursuant to this paragraph shall remain a **cancelled merchant** for all purposes of this policy and any renewal or replacement of this policy, unless **we** expressly agree to reinstate such **cancelled merchant** in writing.

d.  **Collections**

The insured must follow their documented collections procedures prior to determining that a chargeback is an uncollectible chargeback. In the absence of documented collections procedures, the insured must follow normal and customary collections practices generally followed by acquiring banks and merchant processors in the United States.

e. Notification

You must notify us of any portfolio acquisition of merchants by the insured. No portfolio acquisitions will be covered under this policy without our prior written approval.

You must also notify us of any reduction in the balance required to be maintained in the merchant reserve account for any merchant with bank card sales for the most recent calendar year of greater than $6,000,000. Without our prior written consent to any such reduction, for the purpose of calculating loss pursuant to paragraph 2.i., the balance of such merchant reserve account shall be deemed to be the greater of (i) the balance required to be maintained in such merchant reserve account as of the inception of the Policy Period, and (ii) the balance in such merchant reserve account as of the date of any uncollectible chargeback during the policy period.

f. Consolidation-Merger/Increase in Risk

You must give us at least thirty (30) days advance written notice of any material change in the insured's:
1. ownership (including any acquisition of the insured or of all or substantially all of the assets of the insured by another entity, or the merger or consolidation of the insured into or with another entity);
2. scope of operation;
3. security practices or procedures; or
4. form of business organization.

If we determine that a consolidation, merger or acquisition is likely to lead to any new, increased or additional risk, then we may at our sole option:
1. Charge an additional premium;
2. Amend the terms of this policy; or
3. Terminate this policy.

g. Reporting

You will make and maintain an accurate record of all covered transactions for any merchant. On a monthly basis you will report to us a summary of the covered transactions from the prior month.

**4. GENERAL CONDITIONS**

a.   Adjustment of Premium

1.   This **policy** shall be subject to a deposit premium and a *minimum* monthly premium as listed in Item 5 of the Declarations.

2.   The monthly premium shall be an amount equal to the total dollar amount of **covered transactions** multiplied by the rate set forth in Item 6 of the Declarations.

3.   **Your** payment of monthly premium, as calculated by the above methodology, is due by the 25th day of the next calendar month.

b.   Application

1.   **You** represent that the statements contained in the **application** and any materials submitted or required to be submitted therewith (all of which shall be maintained on file by **us** and be deemed attached to and incorporated into this policy as if physically attached), are true and: (i) are the basis of this policy and are to be considered as incorporated into and constituting a part of this policy; and (ii) shall be deemed material to the acceptance of this risk or the hazard assumed by us under this policy. This policy is issued in reliance upon the truth of such representations.

2.   In the event the **application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission:
a.   made with the intent to deceive, or
b.   which materially affects either the acceptance of the risk or the hazard assumed by **us** under the policy,
this policy shall be void.

c.   Concealment, Misrepresentation, or Fraud.

Any relevant provision(s) of this policy shall be void in any case of fraud by **you** or any **insured** as it relates to this policy at any time.   Any relevant provision(s) of this policy shall also be void if **you** or any other **insured**, at any time, intentionally conceals or misrepresents a material fact concerning:
1.   this **policy**;
2.   the application;
3.   the covered **loss**;
4.   the **insured's** interest in the loss; or
5.   a claim under this **policy**.

d.   Service of Suit

In the event **we** fail to pay any amount claimed under the policy, **we** shall at the request of the **insured** submit to the jurisdiction of a court of competent jurisdiction within the United States. Nothing in this provision constitutes or should be understood to constitute a waiver of the right to commence an action in any court of competent jurisdiction in the United States or to

remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States. This service of process suit may be made upon General Counsel, Legal Department, American International Specialty Lines Insurance Company, 70 Pine Street, New York 10270. In any suit instituted against **us** under this **policy**, **we** shall abide by the final decision of such court or of any appellate court in the event of any appeal.

Additionally, any statute of any state, territory, or district of the United States that designates the Superintendent, Commissioner, Director of Insurance, other officer, or successor or successors in office as its true and lawful attorney upon whom service of any lawful process in any action, suit or proceeding instituted by or on behalf of the **insured** or any beneficiary hereunder arising out of this **policy**, may be made, **we** designate the General Counsel, at the above address as the authorized representative to whom to mail such process or a true copy.

## 5. EXCLUSIONS

In addition to the other conditions and limitations, this policy shall not apply to any **loss** arising directly or indirectly from the following:

a.   a **special merchant**;

b.   any transaction involving a **merchant** which occurs after that **merchant** been designated a **cancelled merchant** pursuant to section 3c;

c.   any **loss**, claim, expense or damage of any nature other than **loss** incurred by the **insured**;

d.   any loan or extension of credit given to a **merchant** by the **insured** other than deposit credit extended in the ordinary course of business based on charges in a **covered transaction**;

e.   riot or civil commotion outside any country in which **insured** has an office which is permanently staffed by an employee;

f.   war or insurrection;

g.   the effect of nuclear fission or fusion or radioactivity;

h.   theft or any other dishonest, illegal, criminal or fraudulent act committed by an **insured** or any such entity's officers, directors or employees;

i.   error or omission in programming;

j.   transactions occuring with a **merchant** after the **insured** knew of any receivership, liquidation or bankruptcy of the **merchant** or after notification by Visa and/or Mastercard of the listing of the **merchant** on the VISA/MasterCard Combined Terminated Merchant File, and/or MATCH report;

k.   chargeback transactions from a merchant with bank card sales for the calendar year prior to the inception of the policy of greater than $6,000,000, unless such merchant has been specifically listed on an endorsement to this policy or approved by us in writing prior to such chargeback;

l.   damages for which the insured is or may be held liable to any third party as a result of a lawsuit;

m.   chargeback transaction where the original transaction took place after the involved merchant, with knowledge of the insured, has become the subject of any voluntary or involuntary court filing of bankruptcy; insolvency; or reorganization;

n.   any loss, claim, expense, or damage incurred by the insured in establishing the existence or amount of any loss;

o.   any loss caused or contributed to by the insured, whether in whole or in part, by:
   1.   any accounting or arithmetic error or omission;
   2.   any inability by the insured to locate any book, account, or record;
   3.   any malfunction of any computer hardware or software;
   4.   the failure, malfuntion or inadequacy of any computer component, equipment, program or system to correctly process, recognize, distinguish, interpret or accept one or more dates or times; or
   5.   any mechanical or electronic failure, breakdown or malfunction of machines or systems;

p.   any transaction (including a transaction involving the purchase of goods or services), the subject matter of which transaction is illegal under the laws of the United States or under the applicable laws either of the jurisdiction in which the merchant does business or of the jurisdiction in which the merchant's customer resides;

q.   any bank card transaction which has been the subject of prior notice under another policy of credit card chargeback insurance held by the insured, or which the insured knew (or should reasonably have known of) prior to the inception of this policy, whether or not the bank card transaction is covered by that other policy;

r.   where the insured is unable to identify the merchant;

s.   violation by the insured of the rules or regulations of VISA, MasterCard, Discover or a similar

t.   where the insured is unable to identify the merchant;

u.   arising out of the actual or alleged misuse of confidential information from the insured;

v.   an Independent Sales Organization's participating in the processing of any fraudulent, illegal, criminal, dishonest or illegitimate transaction in collusion with any merchant; or

w.   any loss that could have been recovered, but was not recovered, due to the failure of the insured to pursue reasonable efforts to make recovery from persons responsible for causing it.

## 6. NOTICE AND PROOF OF LOSS

a.   It is a condition precedent to the right to recover under this policy that you shall:

    1.   give written notice to us as soon as practicable and in no event later than the earlier of (a) the end of the discovery period or (b) 60 days after you discover an uncollectible chargeback or become aware of any circumstances that may reasonably give rise to a loss;

    2.   submit a detailed proof of loss;

    3.   submit to examination, under oath if requested, and produce all pertinent records for examination by us, at such reasonable times and places as we shall designate. The insured shall cooperate with us in all other matters pertaining to the loss, including the signing of any necessary documents; and

    4.   immediately take all reasonable efforts to mitigate any actual or potential loss.

b.   No legal proceedings for the recovery of any loss may be brought against us unless, as conditions precedent thereto:

    1.   insured shall have fully complied with all of the terms and conditions of this policy;

    2.   more than ninety (90) days has passed since you submitted its proof of loss; and

    3.   such proceedings are commenced within two (2) years after discovery of the loss.

## 7. ASSISTANCE, COOPERATION, SUBROGATION AND RECOVERIES

The insured shall provide us with all information, assistance and cooperation that we or our counsel may reasonably request. The insured shall not take any action, which in any way increases our exposure under this policy.

In the event of any payment under this policy, we shall be subrogated to the insured's rights of recovery therefore against any person or entity. The insured shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable us effectively to bring suit in our name, and shall provide all

other assistance and cooperation which we may reasonably require. The insured shall do nothing to prejudice such rights.

All recoveries, whether effected by **you**, the **insured** or **us** (except for recoveries from the reinsurance and/or indemnity of **us**), shall be applied (after first deducting the reasonable costs and expenses, incurred in obtaining in such recoveries) in the following order of priority:

1.   **You** and the **insured** shall be fully reimbursed for the amount, if any, by which a **loss** covered under this policy exceeds the amount paid by **us** under this policy;

2.   **We** shall then be fully reimbursed for all amounts paid under this policy; and

3.   Any remaining sum shall be paid to **you** and the **insured** as reimbursement of the Deductible and/or for the amount of its **loss**, which is not covered under this policy.

In determining the amount payable by **us** under this policy for **loss**, all money and all other property and fees received from the **merchant** in connection with the **chargeback** by or for the benefit of **you** or the **insured** shall be deducted from the claimed **loss**.

## 8.   LIMITS OF INDEMNITY AND DEDUCTIBLE

a.   The most **we** shall pay for all **loss** during the **policy period** is limited as follows:

1.   For the total amount of all **loss**, the Annual Aggregate Limit of Indemnity stated in Item **3.** of the Declarations;

2.   For the total amount of **loss** arising from one **bank card**, the Covered Transaction Limit of Indemnity stated in Item **3.** of the Declarations;

3.   For a **single loss**, the amount stated in Item **3.** of the Declarations as **single loss** Limit of Indemnity and shall be the maximum amount payable to the **insured** for such **loss**.

All **loss** involving two or more **merchants** having common ownership shall, as to such **merchants**, be subject to only one **single loss** deductible and one **single loss** Limit of Indemnity. Common ownership means either the power to determine the **merchant's** management or policy, or ownership of ten percent (10%) or more of the **merchant's** outstanding voting stock.

b.   The Annual Aggregate Limit of Indemnity set forth in Item **3.** of the Declarations shall be reduced by the amount of any payment made under this policy. If the Annual Aggregate Limit of Indemnity set forth in Item **3.** of the Declarations is exhausted, **we** shall have no further liability to indemnify the **insured** under this policy for **loss**.

c.    If the Annual Aggregate Limit of Indemnity is reduced by payments for loss to an amount less than the **single loss** Limit of Indemnity, then such **single** loss Limit of Indemnity shall be reduced to equal the reduced amount of the Annual Aggregate Limit of Indemnity.

d.    No limit of indemnity shall be reinstated, in whole or in part by any recovery other than any recovery made by **us** pursuant to Clause 7.

e.    The limits of indemnity apply to all **loss** discovered during the **policy period**. Regardless of the number of years that this policy or any subsequent renewals or replacements continues in force or the number or amount of premiums payable or paid, **our** liability to indemnify the **insured** shall not be cumulative in amount from year to year or from **policy period** to **policy period**.

f.    **We** shall be liable under this policy only for the amount by which any **single loss** exceeds the sum of:

1.    the greater of (i) the balance in the **merchant reserve account** for such **merchant** as of the discovery of the first **uncollectible chargeback** for such **merchant**, and (ii) the amount indicated as the balance in the **merchant reserve account** for such **merchant** in an endorsement to this policy; and

2.    the **single loss** deductible amount set forth in Item 4 of the Declarations.

## 9. EXCLUSIVE POLICY BENEFIT

This Policy is for the exclusive benefit of the **insured** and in no event shall anyone other than the **insured** have any right or action under this policy.

## 10. OTHER INSURANCE

If any other insurance or indemnity covering any **loss** covered by this policy is available to the **insured**, this policy shall only apply to that part of such **loss** which exceeds the amount recoverable from such other insurance or indemnity.

## 11. CANCELLATION OF POLICY AS TO ANY MERCHANT

Coverage under this policy will be deemed **cancelled** as to any **merchant** thirty (30) days after the date of mailing or e-mailing of a written notice to **you** that we desire to cancel this policy as to the **merchant**. The mailing or e-mailing of such notice to **you** at the address shown in Item 1 of the Declarations shall be sufficient proof of notice.

## 12. CANCELLATION OR TERMINATION OF POLICY AS AN ENTIRETY

a.    This policy shall be cancelled

1. ninety (90) days after you receive written notice from us of our desire to terminate or cancel this policy;

2. immediately upon our receipt of a written request from you to terminate or cancel this policy;

3. immediately upon the taking over of you by a receiver, conservator, trustee, liquidator, state, federal or court-appointed official;

4. immediately upon any change of ownership or control by another institution or entity that is not approved by us in writing prior to such change of ownership or control; which approval will not be unreasonably withheld or delayed by us.

5. immediately upon exhaustion of the Annual Aggregate Limit of Indemnity, at which time the premium for this policy shall be considered to be fully earned including any adjustment premiums due but unpaid at that time;

6. Ten (10) days after receipt by you of written notice from us of our desire to terminate or cancel this policy due to non payment of premium; or

7. Immediately upon expiration of the policy period in Item 2 of the Declarations.

b. After cancellation or termination of this policy pursuant to Section 12.a. above, we shall, on written request from you, return to you unearned premium computed as follows:

1. Cancellation or termination pursuant to 12.a.1, 12.a.3 or; on a pro rata basis, unless a loss was discovered prior to the effective date of cancellation or termination pursuant to 12.a.1 or the date of take over pursuant to 12.a.3 or, in which case the premium is fully earned and no return premium is payable.

2. cancellation or termination pursuant to 12.a.2 or 12.a.6; return premium is payable, on a short rate basis, unless a loss was discovered prior to our receipt of a written request pursuant to 12.a.2 or the effective date of cancellation or termination pursuant to 12.a.6, in which case the premium is fully earned and no return premium is payable.

3. Cancellation or termination pursuant to 12.a.5 or 12.a.7; premium is fully earned and no return premium is payable.

The premium for this policy is computed on an adjustable basis. The premium on which we will calculate the return of premium will be the deposit premium plus any additional premium paid or due under GENERAL CONDITIONS Section 4.a. Any premium due from you but not paid to us for any reason will be deducted from the return of premium.

Where provision is made for an unearned premium computed at short rate, the premium for the period in force from the effective date of this policy to the date of cancellation or termination shall be as follows:

| Period in Force | Unearned Premium |
|---|---|
| Up to 30 days | 70% |
| 31 to 90 days | 55% |
| 91 to 180 days | 40% |
| 181 to 273 days | 28% |
| 274 days or more | pro rata |

Any cancellation or termination of this policy pursuant to Section 12.a.3, 12.a.4, 12.a.5 or 12.a.6 terminates our liability for any loss which is discovered after the effective date of such cancellation or termination.

### 13. ASSIGNMENT

Assignment of interest under this Policy shall not bind us unless our consent is endorsed on this policy.

### 14. CHANGES

Notice to or knowledge possessed by any insurance agent or any other person or entity acting or purporting to act on behalf of us shall not effect a waiver of or a change to any part of this policy, or preclude us from asserting any right under this policy. The terms of this policy cannot be waived or changed except by a written endorsement issued by us to form a part of this policy.

By acceptance of this policy, the insured agrees that this policy embodies all agreements existing between insured and us and their and our respective agents relating to this insurance.

### 15. TERRITORY

Coverage shall apply worldwide.

### 16. ENTIRE AGREEMENT

Insured agrees that this policy, including the application and any materials submitted or required to be submitted therewith, and any written endorsement attached, constitute the entire contract existing between them and us or any of its or our agents relating to this insurance.

IN WITNESS WHEREOF, we have caused this policy to be signed by our President and Secretary and countersigned where required by law on the Declarations page by our duly authorized representative.

# CHARTIS SPECIALTY INSURANCE COMPANY

*Merchant Schedule Endorsement #7*

This endorsement, effective 7/06/2011 12:01 AM forms a part of policy number 7078195 issued to Merrick Bank Corporation by Chartis Specialty Insurance Company.

It is agreed that each merchant listed in this endorsement is included for coverage solely with respect to the Merchant Number(s) scheduled below:

| Merchant Name | Merchant Number BIN/PRIN | Scheduled Reserve | Scheduled Deductible |
|---|---|---|---|
| Webeez, Inc dba Tours For Fun | 4447464220398788 | $0 | $250,000 |

07-06-2011
Date

Authorized Representative

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

© Chartis Inc.  All rights reserved.

# CHARTIS SPECIALTY INSURANCE COMPANY

<u>Merchant Schedule Endorsement #8</u>

This endorsement, effective <u>08/10/2011 12:01 AM</u> forms a part of policy number <u>7078195</u> issued to <u>Merrick Bank Corporation</u> by <u>Chartis Specialty Insurance Company</u>.

It is agreed that each merchant listed in this endorsement is included for coverage solely with respect to the Merchant Number(s) scheduled below:

| Merchant Name | Merchant Number BIN/PRIN | Scheduled Reserve | Scheduled Deductible |
|---|---|---|---|
| Galavantier | 960100004108 | Reserve 10%-6 Month Rolling | $250,000 |

08-10-2011
Date

_Authorized Representative_

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

© Chartis Inc.  All rights reserved.

# CHARTIS SPECIALTY INSURANCE COMPANY

Merchant Schedule Endorsement #9

This endorsement, effective 08/18/2011 12:01 AM forms a part of policy number 7078195 issued to Merrick Bank Corporation by Chartis Specialty Insurance Company.

It is agreed that each merchant listed in this endorsement is included for coverage solely with respect to the Merchant Number(s) scheduled below:

| Merchant Name | Merchant Number BIN/PRIN | Schedule d Reserve | Scheduled Deductible |
|---|---|---|---|
| Online Marketing Solutions | 960100004111 | Reserve 10%-6 Month Rolling | $250,000 |

08-18-2011
Date

Authorized Representative

ALL OTHER TERMS, CONDITIONS AND EXCLUSIONS REMAIN UNCHANGED

© Chartis Inc.  All rights reserved.